Filed 1/16/24

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| L.C.,<br><br>     Petitioner,<br><br>     v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>     Respondent;<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Real Party in Interest. | B331041<br><br>(Los Angeles County<br>Super. Ct. No. 22CCJP01555) |

     ORIGINAL PROCEEDING; petition for extraordinary writ.  Philip L. Soto, Judge.  Petition granted.
     Children's Law Center of California, Taylor Lindsley and Sara Taylor, for Petitioner and Minor.

Los Angeles Dependency Lawyers, Law Office of Emily Berger, Emily Berger and Nicole J. Johnson, for Mother.

No appearance for Respondent.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Sally Son, Senior Deputy County Counsel, for Real Party in Interest.

—————————————

In 2022 then-three-year-old L.C. was detained from his mother, D.C. (Mother), following her arrest for transporting six boxes of fentanyl pills with L.C. in the car. After the juvenile court sustained a petition under Welfare and Institutions Code section 300, subdivision (b)(1),[1] and removed L.C. from Mother's care, Mother returned to Mexico (where she had grown up and her family lived) on the advice of her criminal defense attorney concerning criminal charges relating to her arrest. She maintained her positive relationship with L.C. through weekly video calls and completed a three-month in-patient drug treatment program, individual counseling, and parenting classes, as required by her case plan. Mother also submitted to random drug testing, but the Los Angeles County Department of Children and Family Services (Department) had concerns about the validity of the tests performed by Mexico's child protection agency, Desarrollo Integral de la Familia (DIF).

At the 12-month status review hearing the juvenile court terminated Mother's reunification services and set a hearing pursuant to section 366.26 to terminate her parental rights and

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

consider a permanent plan for adoption. In finding a substantial risk of detriment to L.C.'s safety and well-being if he were returned to Mother's care, the court focused on Mother's failure to return to California for drug testing and other services; speculation that L.C. would not receive necessary developmental services in Mexico despite assurances from DIF; and Mother's refusal to surrender herself in response to the arrest warrant.

L.C. seeks extraordinary writ relief, arguing substantial evidence does not support the juvenile court's finding that returning him to Mother would create a substantial risk of detriment to his safety or well-being. We agree. Unlike the criminal justice system, with its punitive purpose and focus on rehabilitation of the offender, the juvenile dependency system is designed to serve the best interests of the child and to reunify the family when it is safe to do so. A parent's decision not to return to the United States—whether in response to a criminal prosecution or the immigration laws, or for some other reason—should not prevent reunification with the parent's child where reunification is in the best interests of the child. This is especially the case here, where Mother has diligently complied with her case plan and maintained a bond with L.C., and DIF can provide services to Mother and L.C. under the continued supervision of the Department. We now grant the petition.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *L.C.'s Emergency Removal from Mother and Detention*
On April 20, 2022 the Department received a referral for three-year-old L.C. alleging general neglect and caretaker absence after Mother was arrested in a parking lot in West

3

Hollywood for transporting six boxes of pills later identified as fentanyl. A social worker from the Multi-Agency Response Team arrived at the scene and spoke with the Drug Enforcement Administration (DEA) agent and Mother. The DEA agent explained he had arranged for a controlled buy of 70,000 fentanyl pills, and Mother and another individual arrived in separate cars with six and two boxes of pills, respectively. L.C. was inside Mother's car.

Mother explained to the social worker that someone had offered her a job to transport the pills. Mother initially stated this was the first time she brought her son along when transporting drugs, then indicated it was the first time she had ever transported drugs. The social worker observed L.C. was clean, well-groomed, and dressed appropriately, and he did not have any physical signs of neglect. The social worker was unable to interview L.C. because of his age.

Following Mother's arrest, L.C. was placed in foster care. The United States Attorney filed a Magistrate's Complaint against Mother on April 22, 2022 charging her with violation of title 21 United States Code section 841(a)(1) for manufacturing, distributing or dispensing a controlled substance, or possessing a controlled substance with intent to manufacture, distribute or dispense. On April 25 Mother was released from custody, and the juvenile court granted an expedited removal order to detain L.C. from her. The Department reported the DEA had tested and confirmed the transported pills were fentanyl.

On April 26, 2022 the Department filed a petition on behalf of L.C. pursuant to section 300, subdivisions (b)(1) and (g), alleging Mother endangered L.C. by transporting drugs while he was in the vehicle and failing to make an appropriate plan for his

4

care and supervision.[2]  The juvenile court detained L.C. from Mother and ordered monitored visitation.

B.    *The Jurisdiction and Disposition Report and Hearing*

A social worker interviewed Mother on May 3, 2022. Mother was born in Guadalajara, Mexico and came to the United States when she was 24 years old.  Mother reported her childhood was stable and free from abuse and neglect, and she denied having any substance abuse or mental health issues.  Mother had been taking care of L.C. since he was born in November 2018 in Montebello, California.  Mother and L.C.'s father had divorced two years earlier, and Mother was no longer in contact with him. Mother had no prior criminal history.

Mother stated L.C. was asleep in the car and woke up when she was arrested.  Mother explained why she transported the pills:  "'I saw it as an easy thing to do, and I needed the money . . . .  I understand that it was a mistake, but I am willing to do everything I can to rectify this.'"  The social worker stated Mother was "polite," "sounded remorseful," and was "willing to face the consequences of her actions."  The social worker observed that L.C. appeared to be developmentally on target.

On May 12, 2022 the criminal case against Mother was dismissed without prejudice.  The next day Mother tested negative for drugs and alcohol.

At the May 20 jurisdiction and disposition hearing the juvenile court sustained the allegation under section 300, subdivision (b)(1), that Mother had endangered L.C. by

_____

[2]    The juvenile court found Nestor T. to be the presumed father of L.C.  The Department conducted due diligence to locate Nestor but was unable to find him.

transporting boxes of fentanyl pills while L.C. was in the vehicle, and the court removed L.C. from Mother's care. The court dismissed the remaining counts. The court ordered Mother to complete a drug and alcohol program with aftercare, parenting classes, and individual counseling to address case issues, and to submit to random on-demand drug and alcohol testing. The court ordered monitored visitation at least three days a week for two hours or by phone, with the Department having discretion to liberalize visitation.

C. *The Reunification Period*

On May 24, 2022 Mother reported to the social worker that Mother's criminal case attorney had advised her that she faced deportation because her illegal status had been disclosed in the criminal case. The attorney recommended Mother take the necessary steps to legalize her status in the United States. Mother had come to the United States with permission to remain for six months, but she stayed beyond the permitted time. Mother planned to return to Mexico, then request permission to come back legally to the United States so she could reunify with L.C.

On May 30 Mother traveled to Guadalajara, Mexico, and the next day she reported to the Department that she had arrived in Mexico. Mother contacted DIF for assistance in locating services to comply with her case plan. On June 2 L.C.'s maternal grandparents arrived in Long Beach, California. They remained in the United States until the end of August 2022 and visited L.C. twice a week during that period. They requested that L.C. be placed with them to live in Guadalajara. On August 5 the juvenile court granted an ex parte application filed by the

6

Department requesting an International Interstate Compact for Placement of Child (ICPC) home study be prepared for DIF to evaluate the maternal grandparents' home in Guadalajara.

On July 18 Mother reported to the Department that her criminal case had been reopened.  Mother's attorney advised her to stay in Mexico and to wait "for a less strict judge to be assigned to the case."  Mother wanted to return to Los Angeles, but she planned to follow her attorney's advice.

During the initial six-month reunification period, Mother remained in communication with L.C. through video calls.  She also was in frequent contact with the social worker and L.C.'s caregivers.  Mother called L.C. once a week by video for about an hour each call.  According to the caregiver, L.C. "responded to mother's affection with smiles and playful behavior during the call[s]" and "would enjoy to hear mother's voice."

On September 22 L.C. was placed with his maternal great-aunt and great-uncle.  Mother consistently had 30-minute calls with L.C. on Mondays, Wednesdays, Fridays, and sometimes Saturdays.  Maternal great-aunt reported that Mother was loving and affectionate during the calls, but the calls had a temporary, adverse impact on L.C.'s mood.  Maternal great-aunt believed the mood change resulted because L.C. missed Mother's attention and interaction.

Mother sought assistance from DIF to find an in-patient drug treatment program.  Mother stated she did not have any drug issues but was willing to participate in a program.  DIF confirmed Mother was participating in parenting workshops and individual counseling.  Mother explained she learned ways to communicate with her son and to educate him, and she had been at fault for failing to give him "'100% quality time.'"  DIF reported

that Mother "'accept[ed] personal responsibility for the facts and work[ed] on the feeling of guilt'" and "'developed tools to control her impulses and regulate her emotional state.'" Mother told the social worker, "'[W]hat I did was not right, I did not see it at the time, I put my child in danger. . . . I committed a big mistake and that is why my son is not with me.'" At the December 12, 2022 six-month review hearing, the juvenile court continued reunification services.

In January 2023 Mother enrolled in "Vive," DIF's three-month in-patient drug and alcohol program. The Vive psychologist reported at the end of May that Mother had completed the 90-day program and continued to attend workshops at least once a week. Mother explained to the social worker that she transported drugs because she wanted to be able to give her son things, but now she realized it was a mistake and she had put L.C. in danger by exposing him to drugs and the wrong type of people. Mother understood the harm she had caused to L.C. and others by her actions and regretted "participating in something that was fatal for other people."

The Department reported that Mother was compliant with her drug and alcohol program, parenting classes, and individual counseling, but not with random drug testing. The Vive psychologist told the social worker that Mother consistently tested negative for drugs while in the program. However, the social worker had not received the drug testing results, and therefore, she could not "verify that [Mother] in fact has remained sober." Vive's coordinator told the social worker the test results were submitted to the department of health in Mexico, and therefore, Vive did not have access to the results.

The Department did not follow up with the department of health (or Mother) to obtain the test results.

After Mother completed the drug treatment program, she started having one-hour video calls with L.C. before his bedtime on Mondays, Wednesdays, and Fridays.[3]  Mother also called L.C. every morning before he went to daycare so she could say good morning and help him have a good day.  Mother was "prepared with activities to engage [the] child and understanding when the child did not want to engage."  L.C. had a hard time ending the video calls with Mother and would cry because he did not want the calls to end.

During this period, the home study for the maternal grandparents was completed, finding they would be a suitable placement, had "good values and customs," adequate housing and income to cover L.C.'s needs, moral support from their children, and a "'willingness and patience to carry out the procedures that have been requested, showing real interest in supporting their grandson."  The maternal grandparents continued to have calls with L.C. on Wednesdays and Fridays for about an hour and a half each visit.  L.C. spoke in English, and the maternal grandmother spoke in Spanish, but they understood each other.

The Department arranged for L.C. to have a psychological assessment after the maternal great-aunt expressed a concern that L.C. may be on the autism spectrum.  A psychologist assessed L.C. for an intellectual disability and autism spectrum disorder and concluded L.C. did not meet the criteria for either diagnosis.  The psychologist stated a diagnosis of borderline

_____

[3]    While Mother was in the drug treatment program, she initially was only allowed to have 10-minute calls with L.C. on Fridays or Saturdays, and later, video calls on Saturdays.

intellectual functioning was indicated and L.C. presented with a language disorder and speech sound disorder. The psychologist recommended that L.C. have an individualized education plan (IEP) and L.C.'s cognitive development be reassessed in a couple of years. Based on the psychological assessment, the regional center closed L.C.'s case because there was "no evidence of a developmental disability that is substantially handicapping."

In May 2023 the Department contacted DIF to inquire about programs with developmental supportive services for L.C. to address the psychologist's diagnosis. DIF's Centro de Rehabilitación Integral (CRI) stated it could provide developmental services for L.C., including "language therapy," provided L.C. was present for an assessment and the maternal grandparents had guardianship rights to make decisions regarding L.C.'s needs and services. The Department noted its concern there would be "unnecessary emotional trauma" from placement of L.C. with the maternal grandparents "considering that the child is a U.S. citizen, has resided in the U.S. his entire life and will need to adapt to a new culture, language and lifestyle if his placement is in Mexico." The Department believed L.C.'s needs would be better met at his current placement with services facilitated "in his native language of English." Mother and the maternal grandparents were Spanish speaking, but L.C. learned English from his babysitter, and L.C. communicated in English.

The social worker conducted a risk assessment and determined the risk level of future abuse by Mother was low based on Mother's progress with her case plan. However, the Department expressed its concern that it was unable to confirm Mother's sobriety. The social worker explained, "Mother has not

10

submitted to a drug test in a DCFS approved facility because she has chosen to abandon her child and flee the country in order to avoid criminal prosecution.  As such, the [D]epartment remains concerned that [M]other may be continuing to engage in drug trafficking and other criminal activities that may endanger the child's safety and well-being."  The Department recommended terminating family reunification services and proceeding to a permanent plan for adoption by the maternal great-aunt and great-uncle.

On June 18, 2023 DIF's mental health and substance use program coordinator reported that DIF intended to request Mother submit to four random drug tests, and he sent the social worker a photograph of the tests that would be used.  Vive subsequently reported to the Department that Mother had completed four random drug tests under the supervision of the head doctor (on June 21, June 28, July 4, and July 7), and it attached photographs of the negative tests.

D.    *The Contested 12-month Permanency Review Hearing*

L.C. and the Department submitted briefs prior to the contested permanency review hearing (§ 366.22) held on August 2, 2023.  L.C. argued the Department had not met its burden to establish a substantial risk of detriment because Mother completed her case plan, acknowledged her prior conduct was a mistake, showed personal growth, and maintained her relationship with L.C.

The Department argued there was a substantial risk of detriment because Mother did not adequately drug test after she left Los Angeles, other than in the drug treatment program, which did not provide evidence of her negative tests, and the

juvenile court should give no weight to the last four drug tests because they were administered using expired tests. The Department also argued L.C. was a "special needs" child and Mother was not prepared to take care of him. Further, Mother had an outstanding warrant for her arrest.

At the contested hearing, the juvenile court observed that if Mother had returned to the United States, she would have had access to services to complete her case plan. The court contrasted cases in which the parents were incarcerated or deported and unable to return legally to receive services to parents like Mother who voluntarily left the jurisdiction. In the former instances, the Department had an obligation to provide services and arrange for drug testing, but in the latter, the parents "are the ones who are making the reasonable efforts unreasonable." The court reasoned as to Mother's failure to complete random drug testing, "just to assume that the programs she went through proves that she's clean and sober really doesn't answer that question which could have been easily answered had she simply come back to Los Angeles." The court added that Mother had not "come back for a visit in California with the child since she left, when she could have done that at any time, and she could have cleared up this issue with the warrant at any time by simply coming in and surrendering herself." The court speculated that if Mother did not have a drug history, "she might well have just gotten a minimal amount of jail time, or maybe no jail time and just probation."

The juvenile court also stated that L.C. was "a special-needs child," and the court had no confidence that adequate services would be provided to L.C. in Mexico. Further, it was not in L.C.'s best interest "to be transported to Mexico without

12

knowing exactly what services and where and how and who will provide them and who will be responsible."  Moreover, L.C.'s developmental needs were being "adequately addressed by the family who has the child here in Los Angeles County."  The court added that it did not believe Mother would follow the court's orders, reasoning that Mother's failure to appear in response to the warrant was as if Mother was saying "I don't care what courts order; I'm going to do what I think I want to do." Therefore, the court had "no reason to believe that she will cooperate."

The juvenile court found by clear and convincing evidence that returning L.C. to Mother presented a substantial risk of detriment; the Department made reasonable efforts to return L.C. to Mother; and Mother was not in substantial compliance with her case plan.  The court terminated reunification services, finding there was no substantial probability of returning L.C. to Mother by the 18-month date because "Mother has not consistently, regularly contacted or visited; not made significant progress in resolving problems that led to the removal; and not demonstrated capacity and ability to complete objectives of the treatment plan and provide for child safety, protection, physical, and emotional wellbeing."  The juvenile court scheduled a section 366.26 permanency planning hearing, which was later continued to March 26, 2024.

L.C. timely filed a notice of intent to file a petition for extraordinary writ, and on September 11, 2023 L.C. filed his petition challenging the order setting the section 366.26 hearing.[4]

---

[4]     Mother also timely filed a notice of intent to file a writ petition.  Mother's counsel filed a notice pursuant to *Glen C. v.*

On December 18, 2019 we issued an order to show cause why relief should not be granted.

**DISCUSSION**

A. *Governing Law and Standard of Review*

During the reunification stage after a child has been removed from a parent's custody, "the court ordinarily must order child welfare services designed to facilitate the reunification of the family. [Citations.] Such services may, depending on the case, include evaluations and assessments, counseling, parent education, substance abuse treatment and testing, and other forms of assistance." (*Michael G. v. Superior Court* (2023) 14 Cal.5th 609, 624 (*Michael G.*).) Reunification services "'"implement 'the law's strong preference for maintaining the family relationships if at all possible.'"'" [Citation.] This is because 'services enable [parents] to demonstrate parental fitness and so regain custody of their dependent children.'" (*Ibid.*; accord, *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1424 ["Until services are terminated, family reunification is the goal and the parent is entitled to every presumption in favor of returning the child to parental custody."].)

At the 12-month status review hearing, the juvenile court "shall order the return of the child to the physical custody of their

*Superior Court* (2000) 78 Cal.App.4th 570 advising the court she was unable to file a petition for extraordinary writ on the merits, and we provided Mother an opportunity to file a supplemental brief in support of her petition. Mother did not file a supplemental brief. However, Mother's counsel subsequently filed a joinder in L.C.'s petition.

14

parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to their parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child." (§ 366.21, subd. (f)(1).) "That standard, while vaguely worded to be sure, must be construed as a fairly high one. It cannot mean merely that the parent in question is less than ideal, did not benefit from the reunification services as much as we might have hoped, or seems less capable than an available foster parent or other family member." (*David B. v. Superior Court* (2004) 123 Cal.App.4th 768, 789.) The Department bears the burden of proving detriment. (*Ibid.*)

In determining detriment, the court shall consider, among other things, "the social worker's report and recommendations," and "the efforts or progress, or both, demonstrated by the parent . . . and the extent to which they availed themselves of services provided, taking into account the particular barriers to a minor parent or a . . . deported parent's . . . access to those court-mandated services and ability to maintain contact with their child." (§ 366.21, subd. (f)(1)(C).) The court shall "make appropriate findings" and "specify the factual basis for its decision." (*Id.*, subd. (f)(1)(C) & (D).)

If detriment is found at the 12-month review hearing, the juvenile court generally has three options: (1) continue the case for up to six months for an 18-month permanency review hearing under section 366.22 (see § 366.21, subd. (g)(1)); (2) schedule a selection and implementation hearing to be held within 120 days under section 366.26 (*id.*, subd. (g)(4); or (3) order the child to remain in foster care (*id.*, subd. (g)(5)). The court shall continue the permanency review hearing under section 366.21,

15

subdivision (g)(1), "only if it finds that there is a substantial probability that the child will be returned to the physical custody of their parent or legal guardian and safely maintained in the home within the extended period of time or that reasonable services have not been provided to the parent or legal guardian." The court may schedule a section 366.26 selection and implementation hearing under section 366.21, subdivision (g)(4), "'only if' it finds 'there is clear and convincing evidence that reasonable services have been provided or offered to the parents or legal guardians.'" (*Michael G., supra*, 14 Cal.5th at p. 625; see § 366.21, subd. (g)(4).)

We review the juvenile court's finding of detriment for substantial evidence by considering whether the evidence, contradicted or uncontradicted, supports the court's finding. (*Georgeanne G. v. Superior Court* (2020) 53 Cal.App.5th 856, 864; *In re B.S.* (2012) 209 Cal.App.4th 246, 252.) "We resolve all conflicts in support of the determination, indulge in all legitimate inferences to uphold the findings, and may not substitute our deductions for those of the juvenile court." (*Georgeanne G.*, at p. 864; accord, *In re I.J.* (2013) 56 Cal.4th 766, 773.) "However, '[s]ubstantial evidence is not synonymous with any evidence. [Citation.] To be substantial, the evidence must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.'" (*Georgeanne G.*, at p. 865; accord, *In re J.A.* (2020) 47 Cal.App.5th 1036, 1046 [while substantial evidence may consist of inferences, any inferences must rest on the evidence; inferences based on speculation or conjecture cannot support a finding].) "'A trial court abuses its discretion when it applies the wrong legal standard or its factual findings are not

16

supported by substantial evidence.'" (*In re R.F.* (2023) 94 Cal.App.5th 718, 728.)

B.    *The Department Failed To Meet Its Burden To Show Return of L.C. to Mother Would Create a Substantial Risk of Detriment*

1.    *Substantial evidence does not support the juvenile court's finding of detriment based on Mother's purported failure to comply with her case plan's drug testing requirement*

As the Department acknowledged, Mother completed a drug and alcohol program with aftercare and participated in parenting classes and individual counseling to address the issues that caused her to lose custody of L.C.  Despite the challenges of complying with her case plan in Mexico, Mother diligently sought out services and completed these case plan requirements. Mother demonstrated insight into the issues that caused her to lose custody, and (contrary to the court's finding), Mother consistently maintained contact with L.C. through video calls multiple times a week and calls every weekday before day care. All reports indicated Mother was loving and affectionate toward L.C., and he enjoyed his video calls with Mother.

With respect to random drug testing, the two tests Mother took while in the United States were both negative.  DIF's three-month in-patient drug and alcohol program (Vive) confirmed that Mother consistently tested negative while in the program. Although the Department points out it was unable to confirm the negative tests because Vive failed to send the test results to the Department, the Department never followed up with the department of health in Mexico to obtain the test results.

17

Instead, the Department required Mother to submit to additional drug testing. Mother promptly coordinated with DIF to complete the testing requirement, and she took four drug tests that DIF reported were negative. The Department did not raise any concerns about the test results with Mother or DIF or request Mother submit to additional testing. Indeed, the Department's July 5 and 10, 2023 last minute information reports for the court described the four negative tests but did not state the Department had any concerns about the tests. It was not until the Department on July 24 filed its opposition to L.C.'s request to be returned to Mother that the Department objected to the four test results on the basis the tests had expired prior to their use.

The juvenile court questioned whether Mother had remained sober notwithstanding her completion of the drug treatment program and submission to drug testing by DIF, noting that if Mother had returned to Los Angeles, the Department could have confirmed her sobriety. Certainly it would have been easier for the Department if Mother submitted to drug testing in Los Angeles, but nothing in the dependency laws requires a parent to complete services in the United States to reunify with a child. Nor does anything in the record suggest DIF, in sponsoring the Vive drug treatment program and performing drug testing, was not equally committed to the sobriety of Mother and safety of L.C. Moreover, there is no evidence that Mother ever had a substance abuse problem or tested positive for drugs.[5] To the contrary, Mother complied with

_____

[5] The juvenile court did not base its concerns about Mother's sobriety on her transport of the boxes of fentanyl pills, but rather, on Mother's failure to submit to drug testing by the Department

18

every request by the Department or DIF to drug test. This case therefore differs sharply from those in which a parent refuses to submit to drug testing or misses a test, which courts properly treat as a positive test. (See *In re Natalie A.* (2015) 243 Cal.App.4th 178, 186 [missed drug tests supported "reasonable inference . . . that father's marijuana use was more frequent than the one admitted instance"]; *In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1217 [missed drug test "properly considered the equivalent of a positive test result"], disapproved on another ground in *In re N.R.* (2023) 15 Cal.5th 520, 560, fn. 18.) On this record, substantial evidence does not support the juvenile court's implied finding Mother failed to maintain her sobriety, placing L.C. at a substantial risk of detriment.

> 2. *Substantial evidence does not support the juvenile court's finding that L.C.'s developmental needs could not be met in Mexico*

Substantial evidence likewise does not support the juvenile court's finding that L.C. was a "special needs" child whose developmental needs could not be met in Mexico. The psychologist concluded L.C. did not meet the criteria for an intellectual disability or autism diagnosis, and the local regional center found L.C. did not have a substantially handicapping developmental disability. However, the psychologist diagnosed L.C. with borderline intellectual functioning, a language disorder, and a speech sound disorder. Contrary to the juvenile court's conclusion that there was no information on "what services really

---

in the United States (or, impliedly, adequate drug testing by DIF).

19

will be provided or where" in Mexico, the record shows that CRI, the DIF-sponsored agency, contacted the social worker to confirm it could provide developmental services, including language therapy, to address L.C.'s needs as long as he was present for the assessment, and the maternal grandparents (or Mother) could make decisions on his behalf. Nothing in the record supports the court's conclusion that if L.C. went to Mexico, he would not receive the services he needed.

The Department contends L.C.'s educational needs would be better met by his current caregivers in his "native language of English." However, the social worker reported that L.C. understands both English and Spanish and is bilingual. Moreover, even if L.C.'s current caregivers could secure superior educational services for L.C., which is far from clear, this does not support a finding of substantial risk of detriment to L.C. (See *David B. v. Superior Court, supra*, 123 Cal.App.4th at p. 789.)

3. *Mother's failure to return to Los Angeles and to surrender to law enforcement do not support a finding of substantial risk of detriment*

The juvenile court inferred from Mother's failure to surrender in response to the outstanding warrant that she would not abide by the court's orders after L.C. was released to her care, and further, the court would have no control over Mother once L.C. was in Mexico. While it was appropriate for the juvenile court to consider the outstanding warrant and that Mother was living in Mexico in determining whether L.C. could be safely returned to her care, the court's "[p]erceptions of risk, rather than actual evidence of risk, do not suffice as substantial evidence." (*In re G.Z.* (2022) 85 Cal.App.5th 857, 883.) Notably,

the Department's 12-month review report concluded the risk of future abuse by Mother was low based on Mother's progress with her case plan. Further, the court's speculation that Mother would not follow the Department's orders is not supported by evidence in the record. While Mother was in Mexico, she consistently communicated with the Department and the caregivers, she was diligent in finding and completing all services the court had ordered, and she followed the Department's orders in submitting to drug testing. Mother had no prior criminal record and no record of criminal activity since her arrest on April 20, 2022.

In addition, DIF cooperated with the Department in providing services to Mother, and DIF was prepared to provide services to L.C. Although the dependency laws do not address the return of a dependent child to a parent in a foreign country under the supervision of the Department, nothing prevents such a return. As the Court of Appeal explained in *In re Sabrina H.* (2007) 149 Cal.App.4th 1403, 1412 in rejecting the mother's argument that her children could not be placed with their maternal grandfather in Mexico, "[The mother] has not pointed to the existence of any manifest reason supporting a ban on child placements in a foreign country. If a foreign placement is in the best interest of a child, such a ban would result in an injustice. For all these reasons, we decline to . . . read an implicit ban on placing dependent children in foreign countries." The court in *Sabrina H.* observed that although the Welfare and Institutions Code does not provide for placement of dependent children in foreign countries, the Uniform Child Custody Jurisdiction and Enforcement Act (Fam. Code, § 3400 et seq.) applies to juvenile dependency proceedings and allows for such placements.

(*Sabrina H.*, at p. 1412.)  Here, the case is even stronger for reunifying a child with a parent in a foreign country.

L.C. relies on *In re A.G.* (2017) 12 Cal.App.5th 994, 997 (*A.G.*) to support his position that Mother's return to Mexico to avoid deportation should not prevent her reunification with L.C. In *A.G.*, the father challenged the reasonableness of court-ordered services the Department provided after he was deported to Mexico following his arrest resulting from his assault of the mother.  The court concluded the juvenile court's finding that the Department "could not provide services to A.J. because he was responsible for his own deportation [was] legally indefensible." (*Id.* at p. 1002.)  The court observed, "Just as there is no ""'Go to jail, lose your child"'" rule in California [citation], there is no 'Go to Mexico, lose your child' rule in California."  (*Id.* at pp. 1002-1003.)  We agree with the principle articulated by the *A.G.* court that a parent's absence from the country due to the immigration laws should not control whether under the dependency laws a child should be returned to a parent's custody.  Moreover, given the overriding concern under the dependency laws for the best interests of the child, this principle should apply regardless of whether the parent was involuntarily deported or elected to leave the country.

While we do not condone Mother's evasion of the criminal charges by remaining in Mexico, the criminal justice and dependency systems have different goals.[6]  As the Supreme Court

---

[6]     The Legislature has recognized that parents in the dependency system may also be subject to the criminal justice system.  In this circumstance, the dependency laws do not penalize the parent for violating the law, instead expressly

recently explained in *Michael G., supra*, 14 Cal.5th at page 623, "The purpose of California's dependency law is 'to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm.'" (Quoting § 300.2, subd. (a).) Consistent with this goal, the dependency laws focus on the best interests of the child at each stage of the proceeding. (See *In re A.J.* (2013) 214 Cal.App.4th 525, 536 ["'[t]he fundamental premise of dependency law is to serve the best interests of the dependent child'"].) Further, during the reunification stage, "[t]he very purpose [of the dependency laws] . . . is to facilitate services that promote the preservation of the family before the court must finally determine whether the family can, in fact, be preserved." (*Michael G., supra*, 14 Cal.5th at p. 634; see *In re A.B.* (2022) 79 Cal.App.5th 906, 931 [before termination of reunification services, "family preservation is the primary focus and the "'parent's interest in reunification is given precedence over the child's need for stability and permanency'"].) Accordingly, notwithstanding her outstanding warrant, Mother's reunification with L.C. must be prioritized if reunification may be achieved safely without risking L.C.'s well-being.

Although the juvenile court commented that if Mother had turned herself in she could have resolved her criminal case without jail time and completed her services in the United States,

---

requiring the Department to provide services to incarcerated parents and to extend the period of services where appropriate. (See § 361.5, subd. (a)(3)(A).)

23

the court's conjecture was not based on anything in the record.[7] Moreover, the fact Mother was avoiding her criminal case obligations does not mean returning L.C. to Mother's care in Mexico, with the support of the maternal grandparents (who were found to be suitable for placement), would be detrimental to L.C. The Department failed to show that returning L.C. to Mother's care in Mexico would adversely impact L.C.'s safety, protection, or physical or emotional well-being. Moreover, L.C. could be returned with family maintenance services provided by the Department or DIF and appropriate conditions to ensure a safe return.[8]

We therefore grant the writ and order the juvenile court to vacate its order made at the August 2, 2023 hearing setting a selection and implementation hearing under section 366.26 and finding a substantial risk of detriment if L.C. were returned to Mother. However, because more than five months have passed since the 12-month review hearing, we do not order the immediate return of L.C. to Mother. Rather, the juvenile court must hold a new review hearing under section 366.21 that focuses on any developments in the case since the last hearing. If no new developments establish a substantial risk of detriment to

---

[7] Mother was initially charged with a violation of title 21 United States Code section 841(a)(1), which, depending on the quantity of drugs at issue, could result in a minimum 10-year sentence. (See 21 U.S.C § 841(b)(1)(A)(vi).)

[8] For example, L.C. and the Department agree that, at least based on conditions existing at the time of the court's order terminating reunification services, if L.C. were returned to Mother, his return should be conditioned on Mother and L.C. living with the maternal grandparents in Guadalajara.

24

L.C. if he is returned to Mother, he must be returned to her care, with any reasonable orders necessary to ensure a safe return. If new developments support a different result, the court may make appropriate orders in light of such a finding.

## DISPOSITION

The petition for extraordinary writ is granted. Let a peremptory writ of mandate issue directing the juvenile court to (1) vacate its order setting a hearing for L.C. under section 366.26 and (2) set a continued 12-month review hearing at the earliest date that protects the rights of the parties to prepare their case. At the new hearing, consistent with this opinion, the court is to consider evidence previously presented and any developments subsequent to August 2, 2023, including information relevant to L.C.'s safe return to Mother. In the interest of justice, this decision shall become final as to this court five days from the date it is filed. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

FEUER, J.

We concur:

SEGAL, Acting P. J.          EVENSON, J.*

---

*      Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

25